UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

NORMA B. GILO,

     Plaintiff,

                                   Case No. 4:15cv291-RH/CAS

vs.

DEPARTMENT OF CORRECTIONS,
STATE OF FLORIDA,

     Defendant.

_____/

## DEFENDANT'S MOTION FOR FINAL SUMMARY JUDGMENT WITH MEMORANDUM OF LAW IN SUPPORT

Defendant, DEPARTMENT OF CORRECTIONS, STATE OF FLORIDA, pursuant to Fed. R. Civ. P. 56, moves this Court for entry of final summary judgment in its favor, on the grounds that there is no genuine issue of material fact, and Defendant is entitled to final summary judgment as a matter of law.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff, Norma B. Gilo ("Gilo"), is a former employee of the Department of Corrections ("Department").   Gilo alleges that she was fired from the Department because of: (1) gender discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Florida

Civil Rights Act of 1992 ("FCRA"), Fla. Stat. § 760 (Count I); (2) pay discrimination, in violation of 29 U.S.C. § 206(d)(1), the Equal Pay Act (Count II); and (3) retaliation, in violation of 42 U.S.C § 2000 et seq., and in violation of the FCRA (Count III).

The Department is entitled to summary judgment as to each of Gilo's claims because she cannot establish a *prima facie* case of gender discrimination, and even if she could do so, the Department had legitimate, non-discriminatory reasons for firing Gilo, which she cannot rebut by establishing they were a pretext for unlawful discrimination. Additionally, there is no evidence of pay discrimination to support her claim brought under the Equal Pay Act, and there is no evidence of retaliation sufficient to withstand this motion for final summary judgment.

## II.   MATERIAL FACTS BEYOND DISPUTE

Plaintiff was hired by the Department as a Senior Physician, Chief Health Officer ("CHO") at Northwest Florida Reception Center ("NWFRC") on October 1, 2010. Gilo I 7:13; Gilo I 9:13-19; Gilo I 46:13-18.[1] (Exhibit 1). Plaintiff's starting salary for this job was $120,000.14, in accordance with the Department pay rates for Board Eligible CHOs.[2, 3, 4]

---

[1] Citations to deposition transcripts are as follows:  deponent, volume number (if applicable), page number, colon, line number, through page number, colon, line number.  For example:  "I 33:13-34:6" refers to volume I, page 33, line 13, through page 34, line 6.

[2] Exhibit 2: Personnel Information Memoranda, p. 6.

[3] Exhibit 3: Personnel Action Request Norma Gilo.

[4] Exhibit 4: Affidavit of Amy Bryant.

Prior to this date, Plaintiff worked previously for the Department from September 18, 1998, through April 30, 2010, as a physician at Gulf Correctional Institution ("Gulf C.I.") in Gulf County.   Gilo I 30:1-3, 35:6-36:11.   While working at Gulf C.I., Plaintiff received two Written Reprimands, the first for "cursing and throwing [her] items" and the second for acting "in an unprofessional manner towards another employee when [she] yelled and screamed at her." [5,6]

Plaintiff retired from the Department on April 30, 2010, before coming back to work for the Department in October 2010 as a Senior Physician, Chief Health Officer at NWFRC.  Gilo I 8:23-25.  This job was exempt from Career Service and within the Selected Exempt Service, thereby Plaintiff was subject to dismissal at the discretion of the agency. *Id.*[7]  Plaintiff began working at NWFRC on October 1, 2010, and the first Incident Report was filed against her on October 22, 2010.[8] Lori Pippin, an Advanced Registered Nurse Practitioner who worked with Plaintiff, stated Plaintiff yelled at an inmate, telling him "you are a murderer and don't deserve anything, and you don't deserve an ortho [sic] consult"; a corrections officer was called to respond to the incident. *Id.* The next Incident Report was filed against Plaintiff on October 25, 2010, when Pippin observed Gilo shouting at a wheelchair-bound inmate and pushing his leg, despite the inmate's statement that

---

[5] Exhibit 5: Written Reprimand, June 20, 2008.
[6] Exhibit 6: Written Reprimand, March 17, 2009.
[7] Exhibit 7: Norma Gilo's Letter of Hire; Exhibit 8: Fla. Stat. § 110.604
[8] Exhibit 9: Incident Report, October 22, 2010.

this was hurting him.[9] In addition to those cited above, there were an additional five Incident Reports filed by various employees against Gilo for her unprofessional conduct and one Written Reprimand from the Warden.[10]

## 1. Do Not Resuscitate Order.

On July 12, 2012, Pippin filed an Incident Report after observing Plaintiff telling an inmate, "if you don't want to take your medication then sign this DNR [Do Not Resuscitate Order]."[11] The inmate refused to sign the DNR, but Gilo signed the DNR and placed the document in the inmate's medical chart despite his refusal to sign the order. *Id.*

Pippin faxed a copy of the unsigned DNR to Cindy Bruns, the Assistant Nursing Director for the Department.[12] Ms. Bruns brought this to the attention of Plaintiff's supervisor, Dr. Hantz Hercule, the Regional Medical Director ("RMD") for Region 1, as well as his superior, Dr. Olugbenga Ogunsanwo, Assistant Secretary for Medical and Health Services for the Department.[13]

On August 15, 2012, Dr. Hercule traveled to NWFRC to discuss Gilo's actions regarding the DNR. The meeting was attended by Plaintiff, Dr. Hercule, Warden William Churchwell, Assistant Warden Norma Kelly, and Monica

---

[9] Exhibit 10: Incident Report, October 25, 2010.
[10] Exhibit 11: Written Reprimand, February 10, 2011, wherein Plaintiff was cited by the Warden for "conduct unbecoming of a public employee and failure to follow oral or written instructions" after she shook her fist and yelled at an inmate. *See also* Exhibits 12, 13, 14, 15, and 16.
[11] Exhibit 17: Incident Report, July 12, 2012.
[12] Exhibit 18: Facsimile from Lori Pippin to Cindy Bruns.
[13] Exhibit 19: Email from Cindy Bruns to Hercule & Ogunsanwo.

Crutchfield, the Health Services Administrator for NWFRC.[14] Plaintiff questioned the reason behind the meeting, asserted she had done nothing wrong, and suggested that Dr. Hercule and Dr. Ogunsanwo lacked any credentials to question Plaintiff. *Id.* Plaintiff stated, "[w]hen I questioned Dr. Hercule and asked to compare his credentials he felt challenged by this."[15]

Dr. Hercule ordered Plaintiff to stop placing unsigned DNRs into inmates' medical charts, and related in a letter drafted the day of the meeting:

> At this time Dr. Gilo was informed that the issue was being reviewed further and a final outcome was pending. In the interim she would be **temporarily reassigned** to Holmes CI for a period of two weeks, beginning tomorrow (August 16th). At this time Dr. Gilo replied that she has a lot of work to do at NWFRC and **she would not be reporting to Holmes CI** where there is no CHO. Dr. Gilo stated "if you do not want me here, I will take annual leave." Warden Churchwell agreed and approved two weeks of annual leave.  Dr. Gilo was asked to submit in writing, her refusal of the temporary assignment.
>
> [...] The meeting concluded with me reiterating that Dr. Gilo was disrespectful and insubordinate with her comments. This is further evidence of Dr. Gilo's unprofessionalism. [...] I recommend termination of this provider.[16] *(emphasis added)*

## 2.   <u>Gilo Terminated for Insubordination.</u>

Dr. Hercule sent the above letter regarding the meeting to his superior, Dr. Ogunsanwo. As RMD, Dr. Hercule was Gilo's direct supervisor. As Assistant

---

[14] Exhibit 20: Memorandum from Dr. Hercule, August 15, 2012.
[15] Exhibit 21: Plaintiff's Amended Answers to Interrogatories, #9.
[16] Exhibit 20, page 2.

Secretary for the Office of Health Services, Dr. Ogunsanwo was Dr. Hercule's supervisor, and the ultimate decision-maker in this case.[17]  Based on Dr. Hercule's letter detailing Plaintiff's insubordination and his recommendation that she be terminated, Dr. Ogunsanwo considered Gilo's refusal of the reassignment to be a failure to follow a direct order, constituting insubordination, which was the basis for his decision to terminate Gilo. *Id.*  Plaintiff concedes that she was terminated as a result of the meeting:

> Q.    After that time, did you come to understand—
> A.    Yes.
> Q.    —why they might think they're terminating—
> A.    Yes.  Because of all this—the incident of the DNR and whatever the outcome of the meeting between me, Hercule, Dr. – Ms. Norma Kelly, the Warden and the OMC Crutchfield.

Gilo I 198:22- 199:9.

### 3.    Plaintiff Alleges Retaliation.

After Plaintiff was terminated, the Department privatized most of its health care through Corizon Health Care ("Corizon"), including health care at NWFRC.[18] Plaintiff alleges she secured employment to resume working at NWFRC on behalf of Corizon, but Dr. Ogunsanwo prevented this by failing to approve her hire. *Id.* Plaintiff filed a Charge of Discrimination with FCHR on March 26, 2013.[19] More than one year later, the only evidence that Dr. Ogunsanwo *may* have

---

[17] Exhibit 22: Affidavit of Olugbenga Ogunsanwo.
[18] Exhibit 23: Plaintiff's Amended Complaint, paragraph 9.
[19] Exhibit 24: FCHR Charge of Discrimination, March 26, 2013.

communicated with Corizon is an email dated May 14, 2014, indicating intent to seek approval from the Department.[20] Gilo admits she does not know for a fact that Dr. Ogunsanwo prevented her from being hired by Corizon.  Gilo I 229:11- 230:2. The contract between the Department and Corizon, in pertinent part, states:

> Department employees terminated at any time by the Department for cause may not be employed or provide services under this Contract.[21]

Nothing in the record indicates that Dr. Ogunsanwo was aware of Plaintiff's filing of an EEOC claim until he was notified of such by counsel in 2015 (two years after the alleged retaliatory incident). Ogunsanwo 12:17-25 (Exhibit 27).

### 4.   <u>Equal Pay Act.</u>

Salary guidelines for the Department are set by Personnel Information Memoranda (individually "PIM"), drafted by the Bureau of Personnel.[22]  The pay rates for Senior Physicians/CHOs, like Gilo, were established based on the employee's medical board eligibility, job title, whether or not the employee was a psychiatrist, and whether the employee worked in the Department's Regional Medical Center or in Region IV (South Florida).  *Id.*  Plaintiff was appointed at the starting yearly salary of $120,000.14 for a board eligible, non-Region IV CHO, in accordance with the applicable PIM.  *Id.*  As CHO, Gilo was in charge of overseeing NWFRC's medical unit, and referred patients that needed specialized or

---

[20] Exhibit 25: Email dated May 14, 2014.
[21] Exhibit 26: Corizon contract, section II(AA)(3)(f).
[22] Exhibit 2, page 6.

acute care to the Regional Medical Center ("RMC") hospital, as NWFRC's infirmary was only equipped for "very mild cases." Gilo I 56:23-59:11.

Plaintiff identified only two male comparators that she claimed were paid higher salaries on the basis of their male gender: Dr. Jean Dure and Dr. Josue Jorge-Caraballo.[23] Both of these men were employed as physicians at the RMC hospital in Lake Butler, and functioned as hospitalists.[24] Gilo I 64:13-19, 65:13-66:1. In Plaintiff's own words, the Department's hospitalists "are in charge of everything, any problem or patient" assigned to them within that hospital. Gilo I 64:13- 66:1. Gilo never worked as a hospitalist for the Department. Gilo I 66:2-8. Dr. Dure and Dr. Caraballo made $135,000.06 yearly, in accordance with the Department's hiring guidelines for non-board certified Senior Physicians employed at RMC as hospitalists.[25]

### III.   THE SUMMARY JUDGMENT STANDARD

A court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'material' if it is a legal element of the claim […] such that its presence or absence might affect the outcome of the suit." *Tipton v. Bergrohr GMBH-Siegen*,

---

[23] Exhibit 21: Plaintiff's Amended Answers to Interrogatories, #4.
[24] Exhibit 28: Dure Personnel Action Request, October 3, 2011; Exhibit 29: Caraballo Letter, January 14, 2010.
[25] Exhibit 2.

965 F.2d 994, 998 (11th Cir. 1992). "[An issue of fact] is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Id.* If the movant satisfies its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the non-movant to come forward with specific facts showing that there is, in fact, a genuine issue for trial. *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.   ARGUMENT

**A.   Count I – Plaintiff cannot establish a *prima facie* case of gender discrimination because she cannot show that she was replaced by a person outside her protected class or was treated less favorably than a similarly situated individual outside her protected class.**

To establish a *prima facie* case of gender discrimination under Title VII based on circumstantial evidence, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside her protected class or was treated less favorably than a similarly situated comparator outside her protected class. *Maynard v. Board of Regents of Div. of Univ. Dep't of Ed.*, 342 F.3d 1281, 1289 (11th Cir. 2003).[26] Plaintiff cannot point to any adverse decision which raises any inference of discrimination. Plaintiff was asked to

---

[26] A plaintiff may also establish a *prima facie* case of discrimination based on direct evidence. *Wooding v. Five Suns Aventura, LLC*, No. 11-20610-Civ, 2012 WL 692173, at *3 (S.D. Fla. 2012). Plaintiff's claims, however, are not premised on any evidence which could conceivably constitute direct evidence of discrimination.

provide any and all support for "Plaintiff's contention […] that Defendant knowingly condoned or ratified different treatment."[27] Plaintiff provided several responses, none of which could be used to demonstrate gender discrimination. She states:

> "If I was a male and my nurse practitioner was male, the problem would have been resolved by my supervisor before it reached the point of termination. I have observed conflicts between the male workers around me being resolved immediately. Dr. Hercule seems to have more respect for male co-workers than the female co-workers and listens to the male workers.  When I questioned Dr. Hercule and asked to compare his credentials he felt challenged by this." *Id*.

This statement clearly does not reflect any gender bias on the part of any of Defendant's employees. Plaintiff also claims:

> "Dr. Hercules was hostile because of we do not [sic] have a working relationship he does not follow up and I feel useless to call him when I had a problem because he does not know what to do when there is a problem. I actually have more experience than Dr. Hercule. Dr. Hercule knows my capability and seems to not care."[28]

These statements merely demonstrate Plaintiff's grievances with her supervisor, and do not constitute any evidence of discrimination. Rather, they serve to underscore Dr. Hercule's and Dr. Ogunsanwo's view of the Plaintiff as insubordinate, as she once again claims to be more experienced than her supervisor, as she did during the meeting on August 15, 2012.[29]

---

[27] Exhibit 21, #10.
[28] Exhibit 21, #9.
[29] Exhibit 20.

No fewer than *three* attempts were made by Dr. Hercule to resolve the conflict between Gilo and Pippin before Gilo's insubordination led to her termination.[30],[31],[32] Furthermore, this Circuit has previously explained that, "'only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of' some impermissible factor, constitute [...] evidence of discrimination." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2001)). Plaintiff has provided no evidence of any such "blatant remarks." *Id.* The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires this Court to grant the motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B.      Count I – Even if Plaintiff could establish a *prima facie* case of gender discrimination, her claims would fail since Defendant had legitimate, non-discriminatory reasons for firing her, which she cannot show were a pretext for unlawful gender discrimination.**

Gilo admitted that a physician in a prison facility run by the Department is under two persons for purposes of understanding the chain of command: (1) the individual prison Warden (for non-medical matters), and (2) the Regional Medical Director (for matters that are strictly medical/clinical). Gilo I 51:8-24.

---

[30] Exhibit 30: Memo from Monica Crutchfield, August 6, 2012
[31] Exhibit 20.
[32] Exhibit 19: Email from Dr. Ogunsanwo/Dr. Hercule to Dr. Gilo.

At the time, Dr. Hercule was the Regional Medical Director ("RMD") for Region 1.  The events which lead to Gilo's termination occurred in 2012, and Gilo readily concedes the incident (recounted below) set off a chain of events.  "I was not treated poorly until the conflict that occurred between myself and a nurse practitioner was reported to my supervisor, Dr. H. Hercule."[33]  The incident was reported by Lori Pippin, ARNP, and documented as follows:

> Dr. Gilo was yelling at I/M [*name redacted*].  She stated, "If you don't want to take your medication then sign this DNR."   I/M [*name redacted*] refused to sign the DNR.  […]  After things calmed down I went to the triage area and saw I/M [*name redacted*] chart and opened it.  Inside the chart I saw a DNR on yellow paper signed by Dr. Gilo with the words written in the patient's signature line, "Refused to sign." See attached copy of DNR.[34]

Amazingly, Gilo finds it ethical to consider a patient's refusal to take medication to be a consent for a DNR, the practical effect of which is to instruct health care providers to not take life-saving measures in the event of an emergency.  Remarkable is the fact that Plaintiff believes patients have a right to consent (or refuse) to sign a DNR, while at the same time acknowledging she conditioned their acceptance of medication on the signing of DNRs.

> Q.   Would you agree that whether it is an inmate or just a regular patient in Florida, the patient has the right to decline a DNR, to sign it?
>
> A.   Yes.

---

[33] Exhibit 21, #9.
[34] Exhibit 17.

Q.    And would you further agree that a physician cannot condition the patient's taking of medication or a DNR is going to be signed by the physician? Do you understand the question?

A.    Yes.

Q.    Go ahead, answer.

A.    In the Department of Correction, because of this kind of patients that are very manipulative –

Q.    They are very what?

A.    Manipulative.  They will use – they'll refuse their medication because they cannot get some other things.

Gilo II 187:10-188:1.

Q.    If you don't take your medication, you are going to get a DNR?

A.    Yes.  What I can say is that during my 11 years and seven months at Gulf CI, this has been used. We have been giving this inmate – we give these inmates a DNR if they refuse their medicine, and then they will take their medicine. And then now, when I went to Northwest Florida, Lori Pippin is an advocate of an inmate. […] She gives medication before you – **she is like treating the inmate as a citizen** – a person that did not commit any crime.

Gilo II 188:23-189:10 *(emphasis added).*

1.    <u>**Law Governing Do Not Resuscitate Orders.**</u>

The Department published Health Services Bulletin No. 15.02.15 ("Bulletin"), which became effective January 24, 2011, and therein established written instructions defining DNRs in the following way:

> **Do not resuscitate order** directs the withholding of
> cardiopulmonary resuscitation […] from the patient in
> the event of the patient's cardiac or respiratory arrest.[35]

Plaintiff herself concedes that she has seen Bulletin No. 15.02.15 before, was familiar with it, and had even seen it before when she worked at the Gulf C.I. Gilo II 183:18-184:21. Under Florida law, a DNR must be voluntary, signed by the patient, and the physician must obtain "informed consent" from the patient in order for the DNR to be valid.[36]   The policy of the Department provides, in pertinent part:

> C.    Once a DNR is deemed appropriate, the attending
> physician is responsible for promptly documenting on the
> medical record the following information:
>
> 1.    The disease and prognosis:   The inmate's primary
> physician has **determined that the inmate is suffering
> from a terminal illness or injury** from which (to a
> reasonable degree of medical certainty) **there can be no
> recovery and which makes death imminent.** […]
>
> 3.    That the DNR has or has not been agreed upon by the
> inmate.  The inmate's physician/clinical associate should
> fully discuss the medical condition with the affected
> inmate.   A competent inmate is allowed to make the
> decision and may voluntarily request and/or agree that a
> DNR (DH 1896) be placed in the medical record. […]
>
> *Id.*  [Emphasis added].

---

[35] Exhibit 31: Health Services Bulletin No. 15.02.15.
[36] Exhibit 32: Rule 64J-2.018(3), Florida Administrative Code (F.A.C.); Exhibit 33: Section 401.45(3)(a), Florida Statutes.

In this case, Gilo signed DNRs on inmates under circumstances where there was **no evidence** the patient was "**suffering from a terminal illness** or injury from which (to a reasonable degree of medical certainty) there can be no recovery and **which makes death imminent**." *Id. (emphasis added)*

## 2.      <u>The Investigation of Gilo for Coercing Inmates Into Signing DNRs and Meeting of August 15, 2012.</u>

It is beyond dispute that Gilo was signing DNRs on behalf of inmates who did not consent to such, and Plaintiff herself has admitted to doing so. Gilo II 188:23-189:10. Dr. Ogunsanwo testified:

> I received an email that was forwarded to me by the assistant director of nursing [...] which basically states that Dr. Gilo had signed a DNR on behalf of an inmate because the inmate refused to sign it.  So the DNR form [...] was attached to that e-mail.  And then when I saw the email and the DNR form, I thought that wasn't right.  So I forwarded it to Dr. Hercule, who was her supervisor.  I said, please explain to Dr. Gilo that a DNR is supposed to be voluntary and nobody should be coerced to sign a DNR form.  That's what I did.[37]

On August 15, 2012, Dr. Hercule travelled to NWFRC for the sole purpose of meeting with Gilo, the Warden, other staff, and nurse Lori Pippin who made the original complaint about Gilo's conduct regarding DNRs for inmates.[38]

## 3.      <u>Gilo Terminated for Insubordination for Refusing a Temporary Assignment at Holmes Correctional Institute.</u>

As Dr. Hercule reported to his superior, Dr. Ogunsanwo, who is the ultimate decision-maker in this case: "Dr. Gilo entered the room and did not have the

---

[37] Exhibit 27: Ogunsanwo 18:21-19:5.
[38] Exhibit 20.

courtesy to greet anyone." *Id.* Dr. Hercule then notes, "After my opening statement regarding the purpose of my visit, Dr. Gilo questioned as to why there now has to be an investigation about DNR" and began to impugn the credentials of both Dr. Hercule and Dr. Ogunsanwo: "Dr. Gilo also stated that she has fourteen years of correctional experience and served in the U.S. Air Force and if I understand what a DNR is and what credentials do I or Dr. O. have to question that." *Id.* These statements clearly show Gilo as being disrespectful and abrasive with Dr. Hercule, her superior. After informing Gilo that she was to be temporarily reassigned to Holmes C.I., she refused, stating that "she would not be reporting to Holmes CI." *Id.* Dr. Hercule concluded with this observation and recommendation:

> This meeting concluded with me reiterating that **Dr. Gilo was disrespectful and insubordinate with her comments. This is further evidence of Dr. Gilo's unprofessionalism.** Warden Churchwell asked what we could do regarding clinical coverage. It was explained that there were still 3 providers at NWFRC and that there were other institutions functioning without a CHO on site. A locum tenens provider could be used if necessary. **I recommend termination of this provider.**[39] *(emphasis added)*

All of the facts stated above are corroborated by Plaintiff's own deposition testimony.[40] The testimony throughout this case is crystal clear that Dr. Ogunsanwo terminated Plaintiff for insubordination.[41] When Dr. Ogunsanwo received the report, he noted Gilo's explicit refusal to temporarily transfer to

---

[39] *Id.*

[40] See Gilo II 194:1-2 (acknowledging she did not greet anyone); Gilo II 194:3-10 (acknowledging she questioned Dr. Hercule); Gilo II 194:16-19 and Gilo II 194:11-18 (questioning the need for an investigation); and Gilo II 194:23-25 (acknowledging she refused to be re-assigned).

[41] Exhibit 22: Affidavit of Olugbenga Ogunsanwo.

Holmes C.I., and instead take annual leave, was insubordination. *Id.* Dr. Ogunsanwo testified:

> Q.   Now, do you see in Dr. Hercule's letter reporting the incident, do you see the sentence that says, Dr. Gilo stated quote "If you do not want me here, I will take annual leave"? Do you see that?
>
> A.   I see that.
>
> Q.   When you got this letter, did you read it?
>
> A.   I did.
>
> Q.   And did you see that particular quote that's attributable to Dr. Gilo?
>
> A.   I saw it.
>
> Q.   And what did you think when you saw that?
>
> A.   Well, I thought **she was being insubordinate**, that she was trying to circumvent the instruction to go on temporary assignment.

Ogunsanwo 37:2-15. *(emphasis added)*

It is clear that Plaintiff was terminated for a legitimate, non-discriminatory reason: insubordination, due to her refusal of a direct order from her superior. *Id*.

**C.    Count II - Plaintiff cannot establish a *prima facie* case of a violation of the Equal Pay Act because she fails to meet the strict standard of proving that she performed substantially similar work for less pay.**

The record establishes that the Department had a job classification system which dictated pay ranges for physicians by region, physician classifications, and other factors including—whether the physicians are Board Certified, Board

Eligible, or Non-Board Eligible.[42]  Each employee within a given category receives the same or similar salary.  *Id.*

The Department has retained experts Chester Palmer and Joshua Gotkin of ERS Group to review pay classifications, pay ranges, and actual salaries for physicians who worked for the Department at the time of Plaintiff's employment. Among the findings, the experts determined that in terms of suggested hiring salaries, "females did better than males by an average of $2,615.17" and that looking at the percentage difference "females did better than males by an average of 1.9% of salary."[43]

Plaintiff fails to meet the strict standard of proving that she performed substantially similar work for less pay.  Gilo's job title and position was that of Chief Health Officer at NWFRC, where she testified "you have the intake, you have to get those—you reclassify those inmates and you send them to the institution."  Gilo I 46:24-47:1-4. Plaintiff offers just two comparators, Dr. Jean Dure and Dr. Jorge Caraballo, and Gilo admits that both men work at the hospital at RMC as hospitalists.[44] Gilo I 66:2-8. Moreover, according to her testimony, Gilo never worked as a hospitalist at any time for the Department.  *Id.*

Nowhere in the record is it shown that a CHO at a reception center performs substantially similar work to that of a hospitalist working at RMC. The record is

---

[42] Exhibit 2: PIM 10-20-02, PIM 11-20-01R, and PIM 11-20-01R2.

[43] Exhibit 34: Expert Report of Chester Palmer & Joshua Gotkin; Exhibit 35: Affidavit of Chester Palmer

[44] Exhibit 21: Plaintiff's Amended Answers to Interrogatories, #4 & #7

devoid of any evidence to indicate that the actual duties of Gilo and the comparators she has identified (Dure and Caraballo) are similar in terms of the work that each performed.  Gilo was a CHO working in a prison reception center, whereas Dure and Caraballo are hospitalists assigned to take care of inmates who are admitted to the Department's acute care hospital (RMC). It has been held "the controlling factor under the Equal Pay Act is job content"—the actual duties that the respective employees are called upon to perform.  *Hodgson v. Behrens Drug Co.,* 475 F.2d 1041, 1049 (5th Cir. 1973), *cert. denied*, 414 U.S. 822 (1973).  As such, there is no genuine issue of fact as to whether or not Gilo's position as a CHO is substantially similar to that of the two hospitalists.

Plaintiff bases her case for violation of the Equal Pay Act on a list she personally compiled from the Department of Health's website in 2012, wherein she found Dr. Caraballo and Dr. Dure and listed them as comparators.[45]   Gilo II 205:20-22.

> Q:   Okay. Let me ask you, in doing your evaluation of the salaries where you came up with only two doctors, other than the list, did you use any other documentation to perform your analysis?
> A:   No.
> Q:   Did you pull the pay scales and the Department pay policies for the relevant periods of time in which all the physicians on your list –
> A:   No.
> Q:   Let me finish the question, please. Did you pull any Department policies regarding salaries and pay ranges for specific specialty

---

[45] Exhibit 21: Plaintiff's Amended Answers to Interrogatories, #4 & #7

and subcategories of physicians at the Department of Corrections?

A:   No.

Q:   Are you aware that hospitalists are paid more than chief health officers?

A:   No.

Q:   And why aren't you aware of that?

A:   I didn't know.

Q:   How much investigation did you do?

A:   I did not – I just look at the list, and that's it. I didn't investigate –

Q:   Then you came to your own conclusion? You came to your own conclusion?

A:   Yeah, that they were, you know –

Q:   So really all you did for your investigation is you got a list, looked up their credentials and looked up their salaries?

A:   Yes.

Gilo II 210:20-25; 211:1-24.

A list compiled by Plaintiff, arbitrarily pulled from the Department of Health's website without any investigation as to the credentials or qualifications of those Plaintiff alleges to be comparators, does not demonstrate gender discrimination or that the Defendant "engaged in policies and practices of employment which willfully, or, in the alternative, recklessly discriminate against the Plaintiff on the basis of her sex by paying her a lesser rate of pay than that paid to males who were performing or were to have performed the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions within Defendant."[46] Plaintiff failed to note that the two

---

[46] Exhibit 23: Plaintiff's Amended Complaint, paragraph 33

comparators she listed to support her claim, Dr. Caraballo and Dr. Dure, are both hospitalists, *not* CHOs like herself, and thus it is erroneous to compare their salaries and pay rates to Plaintiff's salaries and pay rates as their positions are not the same and do not entail the "same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions with Defendant." *Id.*  As the Plaintiff testified:

> Q:     Were you ever a hospitalist for the Department of Corrections?
> A:     Huh-uh.
> Q:     Is that a 'yes' or a 'no'?
> A:     No.
> Q:     No, you were not?
> A:     No, I was not.

> Gilo I 66:2-8.

It has been held that "[i]n this circuit, plaintiffs who attempt to establish a prima facie case under the *McDonnell Douglas* test must show that the comparator is similarly situated in all relevant aspects. When they fail to do so, their claims generally do not survive summary judgment." *King v. Ferguson Enterprises, Inc.*, 971 F. Supp. 2d 1200, 1217 (11th Cir. 2013). Furthermore, even when comparing Plaintiff's salary to that of other CHOs who do perform same or similar job duties to the Plaintiff, Plaintiff is paid at the same or higher rate as that of male CHOs. Analyses performed by the Department's expert witnesses, Dr. Chester I. Palmer and Dr. Joshua A. Gotkin, determined that:

We have performed three analyses comparing the salaries of female senior physicians with those of male senior physicians. Our analyses looked only at salary by gender, not taking into account the properties of particular positons. The average salary for female senior physicians was slightly higher than that of male senior physicians, but not by a statistically significant amount; that is, the difference was within the range to be expected from random fluctuation. The other two analyses took into account variables known to affect salaries, such as whether the physician is a psychiatrist, or suspected to affect salaries, such as years of experience. Both these analyses indicated that female senior physicians were on the average paid more than comparable male senior physicians, but not by a statistically significant amount. Thus, overall, our analyses **do not suggest discrimination against female senior physicians in salaries.**[47] *(emphasis added)*

For the foregoing reasons, Plaintiff can prove no violation of either Title VII or the Equal Pay Act.  As such, this case is ripe for summary judgment.

> **D.    Count III – Plaintiff cannot establish a *prima facie* case of retaliation, and even if she could, she cannot show that Defendant's legitimate non-discriminatory reason was a pretext for actual retaliation.**

To establish a prima facie case for retaliation under Title VII a plaintiff must show that: (1) she engaged in a statutorily protected activity: (2) she suffered materially adverse employment action; and (3) there is a causal connection between her participation in the protected activity and the adverse employment action.  *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).  However, regarding the causal connection prong of the test the Eleventh Circuit has held that "[s]ummary judgment cannot be avoided […] based on

---

[47] Exhibit 34: Expert Witness Report.

hunches unsupported with significant probative evidence." *Raney v. Vinson Guard Services, Inc.*, 120 F.3d 1192 (11th Cir. 1997). Plaintiff has no proof for her retaliation claim:

> Q.    Do you know of anything in writing that shows that Dr. O said no to you being hired at Corizon?
> A.    No.
> Q.    You have never seen an email?
> A.    I have never seen an email.  All I know, that Dr. O did not approve it.
> Q.    Well, you don't know, you were told by somebody at Corizon whose last name you don't know, right?
> A.    Yes.
> Q.    But you don't know for a fact?
> A.    I don't know for a fact. I don't know if he personally talked to him and told him.  All I know is that Alex said "No, you cannot start on July 2nd."
> Q.    But you don't know that Dr. O stopped you from being hired?
> A.    **I don't know.**

Gilo II 229:11-25; 230:1-2 *(emphasis added)*.

Even assuming arguendo that Corizon management did contact Dr. Ogunsanwo, the Department is contractually prohibited from approving a former employee who was previously terminated for employment with the company.[48] Although Dr. Ogunsanwo does not specifically recall Corizon contacting him for a job reference, he testified that if he was contacted, he probably would have told Corizon management that Gilo was previously terminated by the Department.[49]

---

[48] Exhibit 26: Corizon contract (Section II(AA)(3)(F)).
[49] Ogunsanwo 16: 8-19 (Exhibit 27).

Under the terms of the Department's contract with Corizon, the company is prohibited from hiring former employees who have been terminated by the Department.[50] Ogunsanwo 11:20-24.

While courts interpret the causal link requirement broadly, the causal link must be demonstrated by a close temporal proximity between the protected activity and the alleged adverse action. *Redd v. United Parcel Service, Inc.*, 615 F. App'x 598, 606 (11th Cir. 2015). "A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Thomas v. Cooper Lighting, Inc.*, 506 F. 3d 1361, 1364 (11th Cir. 2007). Conversely, here, Plaintiff filed a Charge of Discrimination on March 26, 2013, and there is **no evidence** that Corizon may have even approached Dr. Ogunsanwo until the following year—specifically, in an email dated May 14, 2014.[51] As the Eleventh Circuit has held, "reliance on 'mere curious timing coupled with speculative theories' is not sufficient to impute knowledge and establish a prima facie case of retaliation." *Mitchell v. Mercedes Benz U.S.*, 2015 WL 919986 (11th Cir. 2015). As the above-referenced case law suggests, a period of several months, in this case more than fourteen (14) months, does not establish the requisite temporal proximity as required in this circuit.

## V.    CONCLUSION

---

[50] Exhibit 26: Corizon contract.
[51] Exhibit 25: Email from Dr. Shubert to Dr. Long-Do.

Discovery has demonstrated no evidentiary support for any of Plaintiff's claims, and the Department of Corrections, State of Florida respectfully requests the Court enter Summary Judgment in its favor and against Plaintiff, Norma Gilo.

Respectfully submitted this 21st day of March, 2016.

*/s/ Jeffrey S. Howell*

_____

JEFFREY S. HOWELL
Florida Bar No. 0793840
Phipps & Howell
201 South Monroe Street, 4th Floor
Tallahassee, Florida 32301
Telephone:   850-222-7000
Facsimile:    850-681-3998
jeff@phipps-howell.com

Attorney for Defendant,
Department of Corrections, State of Florida

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of March, 2016, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to the following:  Michael MacNamara at michael@mattoxlaw.com.

*/s/ Jeffrey S. Howell*

_____

JEFFREY S. HOWELL